1

2

3

4

5

6             IN THE UNITED STATES DISTRICT COURT

7

8             FOR THE NORTHERN DISTRICT OF CALIFORNIA

9     DARRYL BROWN,

10              Petitioner,                      No. C 09-04663 JSW

11        v.

12    JAMES WALKER, Warden,                      **ORDER DENYING PETITION
                                                 FOR WRIT OF HABEAS CORPUS**

13              Respondent.

                                            /

14

15          Now before the Court is the petition for a writ of habeas corpus pursuant to 28 U.S.C. §

16    2254 filed by California state prisoner, Darryl Brown ("Brown").  The Petition is now ripe for

17    consideration on the merits. The Court has considered the parties' papers, relevant legal

18    authority, and the record in this case.  For the reasons set forth below, the Petition is DENIED.

19                                      **BACKGROUND**

20          On July 10, 2006 Brown pled guilty to (1) felony assault by means likely to produce

21    great bodily injury (Cal. Pen. Code § 245(a)(1)) with a sentencing enhancement for causing

22    great bodily injury (Cal. Pen. Code §§ 12022.7(a), 1203(e)(3)); and (2) making a criminal threat

23    (Cal. Pen. Code § 422).  (Clerk's Transcript ("CT") at 40-41) (Resp't Ex. 1.)  In addition to

24    pleading guilty to both charges, Brown also admitted all of the alleged priors and sentencing

25    enhancements.  (*Id.* at 41.)  In exchange for his guilty plea, the prosecution agreed to dismiss

26    the great bodily injury sentencing enhancement.  (Reporter's Transcript ("RT") at 3-4) (Resp't

27    Ex. 2.)  On October 19, 2006, the trial court sentenced Brown to two concurrent prison terms of

28    twenty-five years to life for receiving a third strike and a consecutive five-year prison term for

**United States District Court**
For the Northern District of California

1   the prior serious felony enhancement.  (*Id.* at 25-26.)  The trial court dismissed the sentencing

2   enhancements for prior prison terms on account of Brown's mental illnesses.  (*Id.* at 26.)

3       On August 15, 2007, Brown filed a notice of appeal.  (CT at 238.)  On appeal,

4   he sought a reversal of judgment and remand to the trial court for a *Marsden* hearing to

5   determine the nature and extent of his complaints about his legal representation.  (Resp't Ex. 3.)

6   On August 7, 2008, the California Court of Appeal affirmed the trial court judgment on the

7   grounds that Brown "abandoned his request for substitute counsel," as evidenced by his failure

8   to raise the issue in open court at both the change of plea hearing and the *Romero* hearing.

9   *People v. Brown*, 2008 WL3138211, at *2-3 (Cal. Ct. App. Aug. 7, 2008) (Resp't Ex. 6.)  The

10  appellate court also inferred support for their decision from the probation officer's report, which

11  stated that Brown had "previously" wanted a *Marsden* hearing, not that he remained interested

12  in one at the time of his court appearances.  *Id.* at *3.

13      On September 10, 2008, Brown sought review in the California Supreme Court, which

14  was summarily denied on October 16, 2008.  (Resp't Exs. 7-8.)  On October 1, 2009, Brown

15  filed the instant petition.  On October 14, 2011, this Court granted an evidentiary hearing which

16  was held on July 9, 2013.

17                              **STATEMENT OF FACTS**

18      The parties stipulated to the following facts in their joint brief following the evidentiary

19  hearing held on July 9, 2013:

20      Petitioner Darryl Brown is now 50 years old. He has a GED and went to
        one year of college at Evergreen Valley College in San Jose, where he
21      studied computer science.  EH RT 4.[1]  Brown was convicted in Santa Clara
        County of assaulting Norton Buff and making criminal threats against him.
22      EH RT 8.  His appointed attorney was Juan Lopez, a deputy public
        defender.  EH RT 9. His sentence was 25 to life plus 5 years consecutive,
23      or a total of 30 years to life. EH RT 19.

24      On June 26, 2006, Brown wrote a letter to the judge who had presided over
        his preliminary hearing, Andrea Bryan, stating that he had been having

28      ───────────────────────
            [1] The amended Reporter's Transcript of the evidentiary hearing is referred to as "EH
        RT." The exhibits refer to those introduced at the evidentiary hearing, except as otherwise
        noted.

United States District Court
For the Northern District of California

unspecified "problems" with Lopez, and requesting a *Marsden* hearing.[2] EH RT 10-11; Exh. A, CT 230A.  Brown gave the letter to jail personnel to mail to the court a few days after he wrote it.  EH RT 48.  The letter was filed with the court on August 17, 2006.  Exh. A, CT 230A. There is no way to determine when the letter reached the court.

Brown got the idea for the letter from speaking to a public defender who had appeared for him earlier in the case or to whom he had talked on the telephone.  He understood that a *Marsden* hearing was a chance to get together with a judge and explain his problems with his lawyer and the judge would decide whether to give him a new lawyer.  EH RT 12-13.

Lopez went to see Brown at the jail on July 6, 2006.  After Brown showed him a letter dated June 18, 2006 asking for a *Marsden* hearing, they discussed that issue.  EH RT 82, 84, 118; Exh. C.  When asked on direct examination at the evidentiary hearing if he ever told Lopez he had changed his mind and did not want to have a *Marsden* hearing, Brown stated, "Yeah, I think I might have said it."  EH RT 27.  Brown said he "didn't know what he was doing."  *Id.*  However, Brown accurately described the *Marsden* procedure at the evidentiary hearing.  EH RT 12-13 ("what I understood was that it was a motion to get with the judge and the – whoever, Mr. Lopez, and talk out what was the problem, and the judge will decide whether to give me another public defender or not").  Brown also corrected his habeas counsel at the evidentiary hearing, when habeas counsel mistakenly referred to the *Marsden* hearing when he meant the *Romero* hearing.  EH RT 41.

Lopez stated that if Brown had continued to want a *Marsden* hearing after their July 6 meeting, Lopez would have scheduled one in court.  EH RT 84-85.  Lopez did not specifically make a note in his file that Brown had changed his mind about the *Marsden* matter, or wanted to withdraw it, or that Brown was now satisfied with Lopez's representation.  EH RT 119; Exh. C.  However, Lopez testified that if Brown had continued to want a hearing, "I would have made a note of it and actually set a *Marsden* hearing."  EH RT 85; EH RT 121 ("Had he said, I want a *Marsden,* we would have been in court having one.").

Lopez was not reluctant or averse to holding a *Marsden* hearing if Brown had wanted to pursue the motion.  He believed such hearings could actually be "beneficial" because they give the defendant an opportunity to "vent" and explain any issues to the judge in a confidential setting.  EH RT 82-83. Lopez had had many clients make *Marsden* motions, but had never had a judge grant one involving him.  EH RT 115-116.

Lopez was not aware that Brown had gone ahead and mailed the June 26, 2006 letter requesting a *Marsden* motion to the court until about five or six years later, when informed about it by counsel in connection with the current federal habeas proceedings.  EH RT 121-124.

Brown testified at the evidentiary hearing that the "problems" he was having with Lopez were that Lopez had made "a lot of racial comments" to him during their conversations.  EH RT 17-18.  Specifically, he claimed that "a lot of times" Lopez had called him a "nigger" and a "monkey" in

---

[2] *People v. Marsden*, 2 Cal. 3d 118 (1970).

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

face-to-face conversations. EH RT 18. Brown believed Lopez was "disrespecting" him, and it caused him to question whether Lopez was properly representing him in court. EH RT 18.

Brown had also told the probation officer that the victim in this case, Norton Buff, had called him a "nigger." EH RT 49. That allegation was not corroborated by the preliminary hearing witnesses. Exh. A, CT 4-30.

Brown talked to Lopez' supervisor, Craig Kennedy, and explained that he was not getting along with Lopez. He testified that Kennedy was "sarcastic" and seemed not to care. EH RT 24-25. Brown described both Lopez and Kennedy in the same terms, as "flippant and sarcastic." EH RT 19, 49; Exh. A, CT 230A.

Brown acknowledged that he had been diagnosed with paranoid schizophrenia. EH RT 5; Exh. A, CT 117 (Sanchez report); Exh. A, CT 160 (1985 probation report). He acknowledged that his mental problems sometimes caused him to be paranoid about other people. EH RT 49-50. In 1990, a psychiatric doctor at Atascadero State Hospital specifically noted that Brown "is paranoid about white patients and the discrimination he senses against Blacks. [] The patient has a chronic paranoid disorder." Exh. A, CT 93.

Lopez had a "strongly emotional" reaction at the evidentiary hearing to the accusation that he had ever called Brown a "nigger" or a "monkey." EH RT 78. He was "very offended" and "actually disgusted" by the accusation. *Id.* He had "never used racist remarks towards anyone, ever," and had "always fought against racism." *Id.* Lopez noted that he was Mexican and had had racist remarks made against him. *Id.* He "chose to be a public defender to help the underdog." *Id.* He had worked at Castlemont High School in East Oakland, a predominantly African-American school, where the students he taught were "like my kids." *Id.* He had also worked at Centro Legal de la Raza in Oakland and the Family Violence Law Center in Berkeley, and had been employed at the Santa Clara County Public Defender's Office since 1996. EH RT 71-72.

Lopez said his relationship with Brown was "very cordial." EH RT 77. He believed Brown was competent and could assist in his defense. EH RT 75-76. He had no problems communicating with Brown. EH RT 76. He stated that Brown was "a very articulate gentleman," and a "smart individual," who had had a year of college. *Id.*

Lopez had Brown evaluated by a psychologist, Dr. Ubaldo Sanchez, as a precaution given Brown's mental health history. *Id.* Dr. Sanchez found that Brown was competent and "fully aware of what is happening here." Exh. A, CT 115. At the guilty plea hearing, Lopez told the judge that he had no difficulty communicating with Brown, Exh. 3, RT 4, which was an accurate representation. EH RT 87.

Brown never received a *Marsden* hearing in state court. EH RT 13-14. He never had a hearing where he told the judge that he had changed his mind and did not want a *Marsden* hearing. EH RT 27.

Brown did not ask the judge to hold a *Marsden* hearing at the next court appearance after he mailed the letter, which was his guilty plea hearing on

4

United States District Court
For the Northern District of California

July 10, 2006. EH RT 50-51. He testified that he did not raise the issue then because he "didn't think it would matter." He was "just in a lot of trouble and nobody cared," and "whatever I say, I'm still going to put a lot of time." EH RT 51. Although at the outset of the guilty plea hearing the judge had told Brown that if he had any questions he could interrupt the proceedings, Exh. A, RT 4, and Brown did raise a number of questions throughout the hearing, EH RT 54-55, Brown testified that he did not say anything about the *Marsden* issue because it "just didn't seem like it would matter anyway," and he was "overwhelmed with everything." EH RT 54-55.

At the guilty plea, Brown told the judge that he was taking prescription medication, Neuron and Buspar. Exh. 3, RT 4. At the evidentiary hearing, Brown said that at the time of the guilty plea he he was taking Buspar for severe anxiety, Neurontin for mood swings, and Seroquel for depression. EH RT 19-21. Brown stated on the record at the time of the plea that the prescribed medication did not affect his ability to communicate with his attorney. Exh. 3, RT 4. Brown testified at the evidentiary hearing that he told the truth when he said the medication was not affecting his ability to communicate with Lopez. EH RT 53. Brown also said that his symptoms decreased when he was taking prescribed medication. EH RT 50.

Brown stated on the record at the time of the plea that he had had enough time to discuss the case with Lopez. Exh. 3, RT 5. Brown said Lopez had discussed the elements of the crime, the nature of the crime, the possible defenses and the various pleas. Exh. 3, RT 5. When asked at the evidentiary hearing if he had told the judge the truth during the guilty plea, Brown said, "not really, no." EH RT 52. Although he had said yes when asked if he had had enough time to discuss the case with counsel and if counsel had fully explained the case and all options, Brown testified that he understands English and is "articulate," but is not "wrapped too tight," is "not very sane," and is "spaced out." EH RT 56-57.

Brown testified at the evidentiary hearing, on direct examination, that he understood during the guilty plea that he was admitting two strikes that could lead to a sentence of life in prison. EH RT 35; *see* EH RT 58 (cross-examination). Brown said that during the pause in the proceedings after he asked a question about the strikes, Lopez explained off the record that this was the point where Brown would be admitting the two strikes they had discussed in previous conversations. EH RT 35, 57. Brown said he was "just going along with it at that point" because it felt "hopeless." EH RT 57-58.

Lopez had explained the guilty plea process to Brown. EH RT 43 (Brown), 81, 88 (Lopez). Lopez visited Brown in person at least five times, EH RT 21 (Brown), 84 (Lopez), and they had additional conversations on the phone. EH RT 84. Brown testified that although he pled guilty, he "didn't really know what I was getting myself into." EH RT 33. However, he "knew I was in a lot of trouble. I didn't really have too many ways out." EH RT 43.

Brown told the police officer who arrested him for the current offense that he had two strikes. EH RT 44-45; CT 21. He was aware that if he was convicted of a third strike, the possible sentence was 25 years to life in prison. EH RT 45. He was aware that he had had two previous cases where he did not receive a life sentence, because one of the strikes was

1    either dismissed or not charged by the prosecution.  EH RT 46, 67 ("that
     was when I got 32 months"); see EH RT 90 (Lopez noted that in both 1995
2    and 2000, Brown had received sentences of 32 months based on one prior
     strike).  This case was the first one where Brown's attorney had presented a
3    *Romero* motion at sentencing.  EH RT 111-112.

4    Lopez informed Brown at the outset of the case that he was charged with a
     third strike.  EH RT 74.  The Santa Clara County District Attorney's Office
5    three strikes review committee did not make an offer to strike any of the
     strikes in this case, which Lopez expected because the current offense
6    involved a violent offense and Santa Clara is a "tough county."  EH RT 79-
     80.  Therefore, Lopez "prepare[d] as if you're going to trial."  EH RT 79.
7    Lopez did not ask the three strikes review committee to reconsider its
     decision.  EH RT 108.
8
     Lopez explained Brown's options to him and left the decision up to Brown,
9    who decided to plead guilty and pursue a *Romero* motion.  EH RT 80-81.
     Lopez specifically explained that Brown would be admitting the two
10   charges and the two strikes.  EH RT 81.

11   Lopez believed that no written plea form was used in this case.  EH RT
     127-128.
12
     Lopez agreed that no factual basis was ever stated on the record, only that
13   there was a factual basis for the plea.  EH RT 141-142.

14
     (Joint Brief Following Evidentiary Hearing, at 1-6.)
15
           The Court shall address additional facts as necessary in the remainder of this order.
16
                              **STANDARD OF REVIEW**
17
           Petitioner filed his federal habeas petition in 2009, so it is subject to the provisions of
18
     the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA").  Under AEDPA, this
19
     Court will entertain a petition for a writ of habeas corpus "in behalf of a person in custody
20
     pursuant to the judgment of a State court only on the ground that he is in custody in violation of
21
     the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The petition
22
     may not be granted with respect to any claim "adjudicated on the merits" in a state court unless
23
     the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or
24
     involved an unreasonable application of, clearly established Federal law, as determined by the
25
     Supreme Court of the United States; or (2) resulted in a decision that was based on an
26
     unreasonable determination of the facts in light of the evidence presented in the State court
27
     proceedings."  28 U.S.C. § 2254(d).  To determine whether to apply "AEDPA deference" in this
28
     case, the Court must "[c]onsider which state court 'decision' [to] review, and whether that

United States District Court
For the Northern District of California

6

**United States District Court**
For the Northern District of California

1   decision actually 'adjudicated' [Petitioner's] Sixth Amendment claim on the merits." *Williams*

2   *v. Cavazos*, 646 F.3d 626, 635 (9th Cir. 2011). If this Court concludes that no state court

3   adjudicated Petitioner's claim on the merits, then it must determine whether there is an adequate

4   and independent ground of state law that should preclude collateral review as a matter of

5   federalism and comity. *Coleman v. Thompson*, 501 U.S. 722, 729-730 (1991).

6   **A.      Framework.**

7           **1.      State Court Adjudications on the Merits Under AEDPA.**

8           In general, a claim is adjudicated on the merits if there is "a decision finally resolving

9   the parties' claims . . . that is based on the substance of the claim advanced, rather than on a

10  procedural, or other, ground." *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004) (quoting

11  *Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001)). "[A] state has 'adjudicated' a

12  petitioner's constitutional claim 'on the merits' for purposes of § 2254(d) when it has decided

13  the petitioner's right to post conviction relief on the basis of substance of the constitutional

14  claim advanced, rather than denying the claim on the basis of a procedural or other rule

15  precluding state court review of the merits." *Lambert*, 393 F.3d at 696.

16          After the Supreme Court's decision in *Harrington v. Richter*, 562 U.S. 86, __, 131 S.Ct.

17  770, 784-85 (2011), federal courts deciding habeas petitions must presume that state courts have

18  adjudicated a constitutional claim on the merits. But the *Richter* presumption only remains

19  intact "in the absence of any indication or state-law procedural principles to the contrary" that

20  would give "reason to think some other explanation for the state court's decision is more

21  likely." *Id.* The fact that a state court opinion completely omitted any citation to federal

22  precedent is not a sufficient indication of a non-merits-based adjudication of a federal claim.

23  *Williams*, 646 F.3d at 639 (citing *Early v. Packer*, 537 U.S. 3, 8 (2002)). This is because state

24  court decisions that directly cite to "cases which themselves rested on Supreme Court

25  precedent, and [where] the state court holdings were consistent with the reasoning of the cited

26  cases," are also considered to have adjudicated a federal claim on the merits. *Baker v. Blaine*,

27  221 F.3d 1108, 1112 (9th Cir. 2000). This method of determining "indirect" state court

28  adjudications on the merits is known as the *Baker* approach. *Williams*, 646 F.3d at 640.

United States District Court
For the Northern District of California

1          Under Ninth Circuit precedent interpreting *Richter*, a summary denial by the California

2    Supreme Court is not presumed an adjudication on the merits where it arises from a petition for

3    discretionary appellate review of a decision by a lower state court.  *Id*. at 636; *see also Camper*

4    *v. Workers' Comp. Appeals Bd.*, 3 Cal. 4th 679, 679 n.8 (1992) ("[W]e reiterate the well-

5    established rule in this state that a denial of a petition for review is not an expression of opinion

6    of the [California] Supreme Court on the merits of the case.").  In contrast, when the California

7    Supreme Court exercises its habeas jurisdiction as opposed to discretionary appellate review,

8    the merits of the claim are presumed to be adjudicated because the court has ruled upon an

9    original petition and is not merely passing on the opportunity to review a lower state court's

10   decision.  *Williams*, 646 F.3d at 635-36.  Therefore, after *Richter*, AEDPA deference is only

11   necessarily applied to a summary denial when that summary denial is of an original state habeas

12   petition.  *Id.*

13         If a federal court concludes that no state courts have adjudicated a federal claim on the

14   merits, then it must review the claim de novo.  *Cone v. Bell*, 556 U.S. 449, 472 (2009); *see also*

15   *Pirtle v. Morgan*, 313 F.3d 1160, 1167-68 (9th Cir. 2002).  "[W]hen it is clear that the state

16   courts did not reach the merits of the petitioner's constitutional claim, federal habeas review is

17   not subject to the deferential standard that applies under AEDPA . . . ."  *Williams*, 646 F.3d at

18   637 (internal quotations and citation omitted).  De novo review is appropriate in these rare

19   circumstances because "the basic structure of federal habeas jurisdiction" is "designed to

20   confirm that state courts are the principal forum for asserting constitutional challenges to state

21   convictions."  *Richter*, 131 S.Ct. at 787.  "When those 'principal forum[s]' are provided the

22   opportunity to adjudicate constitutional challenges but fail to do so, whether intentionally or

23   inadvertently, the only remaining forum – the federal courts – must do so in the first instance."

24   *Williams*, 646 F.3d at 637.

25         Upon de novo review, a federal habeas court reviewing a state court ruling ordinarily

26   applies a harmless error standard, examining whether the error "had substantial and injurious

27   effect or influence."  *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993); *see also Schell v. Witek*,

28   218 F.3d 1017, 1022 (9th Cir. 2000).  Under this standard, federal habeas petitioner obtain

United States District Court

For the Northern District of California

plenary review of their constitutional claims, but they are not entitled to collateral relief based on trial error unless they can establish that the error resulted in "actual prejudice." *Brecht*, 507 U.S. at 637.

## 2.    The Adequate and Independent State Grounds Doctrine.

If a federal court finds that a constitutional claim was not adjudicated on the merits in the state courts, it will nonetheless refrain from review if the state decision denying relief rests upon a state law ground, procedural or otherwise, "that is independent of the federal question and adequate to support the judgment." *Coleman*, 501 U.S. at 729-730.  A procedural bar to federal review arising from state law need not be confined to situations of procedural default, *i.e.*, where a petitioner has failed properly to raise his claim before a state appellate court. *Id.* at 731-32.  This is because the procedural default rule is a specific instance of the more general adequate and independent state grounds doctrine. *Wells v. Maass*, 28 F.3d 1005, 1008 (9th Cir. 1994).

Under the adequate and independent state grounds doctrine, a state procedural rule is sufficient to foreclose review of a federal question, but an inquiry into the adequacy of such a rule "is itself a federal question." *Douglas v. Alabama*, 380 U.S. 415, 422 (1965). "To be 'adequate,' the state procedural bar must be '[c]lear, consistently applied, and well-established at the time of the petitioner's purported default.'" *Melendez v. Pliler*, 288 F.3d 1120, 1124 (9th Cir. 2002) (quoting *Calderon v. U.S. District Court*, 96 F.3d 1126, 1129 (9th Cir. 1996)). "A federal court 'should not insist upon a petitioner, as a federal procedural prerequisite to obtaining federal relief, complying with a rule the state itself does not consistently enforce.'" *Melendez*, 288 F.3d at 1124 (quoting *Siripongs v. Calderon*, 35 F.3d 1308,1318 (9th Cir. 1994)); *see also Wells*, 28 F.3d at 1010. "Nor should the federal court enforce a bar grounded on a rule which is unclear or uncertain." *Melendez*, 288 F.3d at 1124 (citing *Moralez v. Calderon*, 85 F.3d 1387, 1390-92 (9th Cir. 1996)). In addition, a state law procedural rule is not adequate to prevent federal review if the petitioner could not have been "deemed to have been apprised of [the rule's] existence" at the time he omitted the procedural step in question. *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 457 (1958). "In other words, we are barred

1   from reviewing a state court decision resting on a procedural ground only if petitioner could

2   have known of the procedural requirement and yet still failed to follow it." *Moore v. Parke*,

3   148 F.3d 705, 709 (7th Cir. 1998).

4   **B.     Analysis.**

5          In order to determine the appropriate standard of review here, the Court must first

6   resolve whether the opinion of either the California Supreme Court or the California Court of

7   Appeal constituted an adjudication on the merits. *See Richter*, 131 S.Ct. at 784-85.  If there was

8   no adjudication on the merits by either state court, then the Court must determine whether the

9   ground for adjudication, construed as procedural or otherwise, is adequate and independent such

10  that preclusion of collateral review is appropriate as a matter of federalism and comity.

11  *Coleman*, 501 U.S. at 729-730.  If the Court finds that the state bar is inadequate to preclude

12  federal habeas review, *Douglas*, 380 U.S. at 422, then it will not apply AEDPA deference and

13  will evaluate Brown's claim de novo, *Cone*, 556 U.S. at 472.

14         **1.      The State Courts' Adjudication of Brown's Sixth Amendment Claim.**

15         The Court must first consider whether the California Supreme Court, as the state court

16  of last review, adjudicated Brown's claim on the merits. *See Richter*, 131 S.Ct. at 784-85.  The

17  California Supreme court denied review of Brown's claim in its discretionary appellate

18  capacity, not as a court exercising original state habeas jurisdiction.  (Resp't Exhs. 7-8.)  As

19  such, it did not adjudicate Brown's claim on the merits under the federal standard set forth in

20  *Richter* or the California standard set forth in *Camper*.  *See Richter*, 131 S. Ct. at 784-85;

21  *Camper*, 3 Cal. 4th at 679 n.8.  Accordingly, this Court may look through the summary denial to

22  the last reasoned state court opinion that addressed Brown's claim, *see Ylst*, 501 U.S. at 801-06,

23  without yet having to apply AEDPA deference, *see Richter*, 131 S. Ct. at 784-85.

24         The only state court opinion to provide more than a summary denial of Brown's claim is

25  the unpublished opinion of the California Court of Appeal. *Brown*, 2008 WL 3138211, at *2-3.

26  However, applying the standard set forth by *Richter*, *Williams*, and *Lambert*, it is clear that the

27  California Court of Appeals did not adjudicate the merits of Brown's Sixth Amendment claim.

28  *See, e.g., Lambert*, 393 F.3d at 969.  In order to have done so, the state court would have needed

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1   to address the "substance" of the claim.  *Id.*  Brown's claim is that his Sixth Amendment right

2   to effective assistance of counsel was violated because an irreconcilable difference between

3   himself and his court-appointed attorney was left unaddressed by the trial court.  (Pet. at 6.)

4   The substance of that claim is whether Brown's court-appointed attorney was constitutionally

5   sufficient, not whether Brown abandoned his *Marsden* motion by failing to satisfy a procedural

6   requirement.  The failure to satisfy a procedural requirement, however, is precisely what the

7   California Court of Appeal relied upon in denying the claim.  Because Petitioner did not orally

8   raise his filed and pending *Marsden* motion in open court, the appellate court held that

9   Petitioner was procedurally barred from having his claim adjudicated on the merits.  *See Brown*,

10  2008 WL 3138211, at *2-3.  The state court also found that statements made by a prisoner to a

11  probation officer outside of court, while in prison, may be sufficient to constitute an

12  abandonment of a pending substitution of counsel motion.  *Id.*  Whether the Sixth Amendment

13  claim had substantive merit, *i.e.*, whether an irreconcilable conflict existed between Petitioner

14  and his attorney, was never directly addressed.

15          Accordingly, this Court finds that there was no adjudication of Petitioner's claim on the

16  merits in state court.  The claim is nonetheless precluded from federal collateral review if the

17  state procedural bar – here the finding of abandonment – rests upon an adequate and

18  independent state ground.  Respondent, in his answer to the order to show cause, characterizes

19  Petitioner's claim as "procedurally barred," but does not address whether the bar precludes

20  federal review as a matter of federal constitutional law.  (Resp't Memo. at 5.)  The Court will

21  sua sponte address this issue.

22          **2.      Adequacy of State Court's Adjudication of Procedural Abandonment.**

23          Unlike the procedural posture presented in *Williams*, where the state court failed to

24  address the Petitioner's Sixth Amendment claim, here, the state court did make an adjudication,

25  just not one on the merits.  *Compare Williams*, 646 F.3d at 638-39, *with Brown*, 2008 WL

26  3138211, at *2-3.  As a result, this Court must consider, as a federal question, whether the

27  California Court of Appeal's finding of procedural abandonment rests upon an adequate and

28

11

**United States District Court**
For the Northern District of California

1   independent ground of state law so as to preclude federal review of Petitioner's request for

2   habeas relief. *See Douglas*, 380 U.S. at 422.

3      As discussed above, the California Court of Appeal based its decision to affirm the

4   judgment of the trial court on the ground that Petitioner "abandoned his request for substitute

5   counsel" and, as a result, "the trial court did not err by failing to hold a *Marsden* hearing."

6   *Brown*, 2008 WL 3138211, at *1-2. The court based the abandonment finding on: (1)

7   Petitioner's failure to raise the issue in open court; and (2) a statement in the probation officer's

8   report that Petitioner had "previously" wanted a *Marsden* hearing.

9      The first California procedural rule that may be inferred from this opinion is that a

10  defendant represented by court-appointed counsel has a duty to bring a *Marsden* motion to the

11  trial court's attention in open court despite already having filed said motion pro se. *See Brown*,

12  2008 WL 3138211, at *2-3. An additional procedural rule that may be inferred is that a

13  defendant has a duty to avoid making statements out of court that could be construed as

14  abandonment of a *Marsden* motion if he seeks an adjudication of that motion. *Id.*

15     Because this Court has already found that there was no adjudication of Petitioner's

16  federal claim on the merits, even indirectly, the opinion of the California Court of Appeal is

17  sufficiently "independent" of federal law for purposes of the adequate and independent state

18  grounds doctrine. *See Coleman*, 501 U.S. at 732-35. But, if the aforementioned procedural

19  rules are unclear, uncertain, not consistently applied, or not well-established, then the

20  procedural bar is not "adequate" as a matter of federal law, and the Court will review

21  Petitioner's claim de novo. *See Melendez*, 288 F.3d at 1124. An additional and independent

22  inquiry is whether Petitioner could have been apprised of these procedural rules as applied by

23  the appellate court at the time he needed to abide by them in the trial court proceeding. *See*

24  *NAACP*, 357 U.S. at 457; *Moore*, 148 F.3d at 709. If not, this constitutes a separate ground for

25  a finding of inadequacy of the state procedural bar.

26     As the ground for the California Court of Appeal's finding of procedural abandonment

27  in the instant case – Petitioner's failure to raise the pending *Marsden* motion – is not supported

28  by any precedent, it must be adjudged inadequate as a matter of federal law. *See Melendez*, 288

United States District Court

For the Northern District of California

1    F.3d at 1126.  The absence of any supporting California precedent precludes the possibility of

2    the procedural bar being "clear" or "well-established."  *See id.*  Accordingly, because there was

3    no existing precedent that could have made Petitioner aware of a putative duty to remind the

4    trial court of the motion, he could not have amended his conduct to conform with such rule at

5    the trial court level.  *NAACP*, 357 U.S. at 457; *Moore*, 148 F.3d at 709.

6          Nor has this Court found precedent holding that a defendant's statement to a probation

7    officer can be used to show abandonment of any motion, let alone a motion for substitution of

8    counsel.  The California Court of Appeal did not cite to a single case in support of this

9    proposition.  As a result, that finding is also adjudged inadequate.

10         Accordingly, the Court finds that the state law procedural grounds for denying

11   Petitioner's claim on state appeal are inadequate as a matter of federal law to preclude

12   adjudication of Petitioner's constitutional claim, *see Douglas*, 380 U.S. at 422, and will review

13   Petitioner's Sixth Amendment claim de novo, *see Cone*, 556 U.S. at 472.

14                                    **DISCUSSION**

15         Brown directly complains of the state trial court's failure to conduct a *Marsden* hearing.

16   However, the only actionable implication of that claim on collateral review is whether the state

17   trial court permitted Brown to suffer ineffective assistance of counsel.  *See Schell*, 218 F.3d at

18   1024-26.  In other words, the issue of federal habeas review is the substance of the Petitioner's

19   unadjudicated Sixth Amendment claim.  *See id.*

20         The parties stipulated to the following conclusions of law in their joint brief following

21   the evidentiary hearing:

22         A federal habeas petitioner bears the burden of proving the facts underlying
           the alleged constitutional error by a preponderance of evidence.  *McKenzie*
23         *v. McCormick*, 27 F.3d 1415, 1418-19 (9th Cir. 1994).  The petitioner must
           affirmatively show that error occurred; if the court finds the evidence
24         proffered on the threshold question of error to be evenly balanced, "the
           party with the burden of proof loses."  *Simmons v. Blodgett*, 110 F.3d 39,
25         41-2 (9th Cir. 1997).

26         A certificate of appealability (COA) may be granted under 28 U.S.C. §
           2253(c) only if a habeas prisoner makes a substantial showing of the denial
27         of a constitutional right, which means that reasonable jurists could debate
           whether the petition should have been resolved in a different manner.
28         *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000).  Respondent is not
           required to obtain a COA before appealing.  Fed. R. App. P. 22(b)(3).  If

United States District Court
For the Northern District of California

1
2
3
4

this Court bases its ruling here on its resolution of credibility issues, a COA is unwarranted, because the district court's factual findings are reviewed on appeal under the clearly erroneous standard, *Lopez v. Thompson*, 202 F.3d 1110, 1116 (9th Cir. 2000) (en banc), and a court's findings based on credibility "can virtually never be clear error."  *See Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985).

5   (Joint Brief Following Evidentiary Hearing, at 11-12.)

6   **A.      Sixth Amendment Claim.**

7          When Brown submitted his pro se letter to the state trial court seeking a *Marsden*

8   hearing, he indicated that he and his counsel, Lopez, had been having problems for months,

9   such that he felt he needed to ask another public defender for assistance.  This substantive

10  complaint may be the basis for a contention that he was denied effective assistance of counsel.

11  (*See* CT at 230A.)  Moreover, Brown expressed to his probation officer weeks later that he (1)

12  believed his attorney was working with the District Attorney and the state trial judge, and (2)

13  did not understand his strike priors were being alleged.  (*See id.* at 194.)

14         Brown testified at the evidentiary hearing before this Court that the problems he claimed

15  to have had were that Lopez had made "a lot of racial comments" to him during their

16  conversations.  EH RT 17-18.  Specifically, he claimed that "a lot of times" Lopez had called

17  him a "nigger" and a "monkey" in face-to-face conversations.  EH RT 18.  Brown believed

18  Lopez was "disrespecting" him, which caused him to question whether Lopez was properly

19  representing him in court.  *Id.*  Brown also testified that he talked to Lopez's supervisor, Craig

20  Kennedy, to explain that he was not getting along with Lopez.  EH RT 24-5.  He testified that

21  Kennedy, like Lopez, was "flippant and sarcastic."  EH RT 19, 49; Exh. A, CT 230A.

22         Lopez, however, testified that he had "never used racist remarks towards anyone, ever,"

23  and had "always fought against racism."  EH RT 78.  Rather, Lopez said his relationship with

24  Brown was "very cordial," and that he had no problems communicating with is client.  EH RT

25  76-7.  Furthermore, at the guilty plea hearing, Lopez told the judge that he had no difficulty

26  communicating with Brown.  Exh. 3, RT.  Additionally, Brown stated on the record at the time

27  of the plea that the prescribed medication he was taking had no effect on his ability to

28  communicate with his attorney.  Exh. 3, RT 4.  Brown testified at the evidentiary hearing that he

1   told the truth when he said the medication was not affecting his ability to communicate with

2   Lopez.  EH RT 53.

3          The Sixth Amendment grants criminal defendants who cannot afford to retain counsel

4   the entitlement of an effective, court-appointed attorney.  U.S. Const. Amend. VI.  This right

5   attaches at all "critical" stages of the criminal proceedings, *United States v. Wade*, 388 U.S.

6   218, 227-28 (1967), including arraignment, *Hamilton v. Alabama*, 368 U.S. 52, 53 (1961), and

7   sentencing, *Gardner v. Florida*, 430 U.S. 349, 358 (1977).  A claim of ineffective assistance of

8   counsel is cognizable as a claim of denial of this right to counsel.  *Strickland v. Washington*,

9   466 U.S. 668, 686 (1984).  A criminal defendant who cannot afford to retain counsel, however,

10  has no right to counsel of his own choosing.  *Wheat v. United States*, 486 U.S. 153, 159 (1988).

11  Nor is he entitled to an attorney who likes and feels comfortable with him.  *United States v.

12  Schaff*, 948 F.2d 501, 505 (9th Cir. 1991).  "[T]he ultimate constitutional question the federal

13  courts must answer here is . . . whether . . . the conflict between [the petitioner] and his attorney

14  had become so great that it resulted in a total lack of communication or other significant

15  impediment that resulted in turn in an attorney-client relationship that fell short of that required

16  by the Sixth Amendment."  *Schell*, 218 F.3d at 1026.

17         Moreover, even if the attorney-client relationship does not improve by the conclusion of

18  the case, this does not indicate that the defendant necessarily suffered a Sixth Amendment

19  violation.  As the *Schell* court stated, "[i]t may be the case, for example, that because the

20  conflict was of [the petitioner's] own making, or arose over decisions that are committed to the

21  judgment of the attorney and not the client, in fact he actually received what the Sixth

22  Amendment required in the case of an indigent defendant, notwithstanding the State trial court's

23  failure to inquire."  218 F.3d at 1026; *see also Brookhart v. Janis*, 384 U.S. 1, 8 (1996) ("[A]

24  lawyer may properly make a tactical determination of how to run a trial even in the face of his

25  client's incomprehension or even explicit disapproval.").

26         The Sixth Amendment grants Brown, who cannot afford to retain counsel, the

27  entitlement of an effective, court-appointed attorney.  *See* U.S. Const. Amend. VI.  However,

28  Brown has no right to counsel of his own choosing.  *See Wheat*, 486 U.S. at 159.  Nor is Brown

1    entitled to an attorney who he likes and feels comfortable with.  *See Schaff*, 948 F.2d at 505.

2    Thus, even if Lopez was disrespectful to Brown, this does not mean that Brown necessarily

3    suffered a Sixth Amendment violation.

4           In order for the Court to find a Sixth Amendment violation, the conflict between Brown

5    and Lopez must have become so great as to result in a total lack of communication.  However,

6    the Court finds that Brown was able to communicate with his defense team throughout his

7    representation.  Specifically, Brown demonstrated his ability to communicate by (1) giving

8    Lopez the names of potential trial witnesses; (2) providing his background to a paralegal for the

9    three-strikes history; (3) discussing discrepancies in the police reports with the psychologist; (4)

10   conferring with counsel off the record when he raised questions during the guilty plea hearing;

11   (5) writing letters to Lopez both before and after the guilty plea in which he discussed his case;

12   and (6) providing Lopez and a paralegal with a comprehensive social history for the

13   *Romero* motion.  EH RT 35, 60, 97-99, 129-31; Exhs. 4, 8, A, E; CT 88-96, 115.

14          Accordingly, the Court finds no conflict between Brown and Lopez that had become so

15   great that it resulted in an attorney-client relationship that deprived Brown of the representation

16   he was guaranteed by the Sixth Amendment.

17   **B.     The Effect of Brown's Guilty Plea.**

18          The instant petition arises from a guilty plea.  This raises the question of whether

19   Brown's Sixth Amendment right to effective assistance of counsel was violated either before or

20   after he entered a guilty plea.

21          **1.      Brown's Sixth Amendment Right Was Not Violated Pre-Plea.**

22           The Court will first decide whether Brown was deprived of the constitutional

23   protections of the Sixth Amendment guarantee of effective assistance of counsel before entering

24   a guilty plea, in conformity with longstanding standards and limitations.

25          A defendant who pleads guilty cannot later raise independent claims in a federal habeas

26   corpus proceeding relating to the deprivation of constitutional rights that occurred before the

27   plea.  *See Tollett v. Henderson*, 411 U.S. 258, 266-67 (1973).  The only challenges left open in

28   federal habeas corpus after a guilty plea are the voluntary and intelligent character of the plea

United States District Court

For the Northern District of California

and the nature of advice of counsel to plead. *Hill v. Lockhart*, 474 U.S. 52, 56-57 (1985); *Tollett*, 411 U.S. at 267.

The Due Process Clause of the Fourteenth Amendment requires that a guilty plea be both knowing and voluntary because it constitutes a waiver of three constitutional rights: the right to a jury trial, the right to confront one's accusers, and the privilege against self-incrimination. *See Boykin v. Alabama*, 395 U.S. 238, 242-43 (1969). The state court is not required to enumerate all the rights a defendant waives when he enters a guilty plea as long as the record indicates that the plea was entered voluntarily and understandingly. *See Rodriguez v. Ricketts*, 798 F.2d 1250, 1254 (9th Cir. 1986); *Wilkins v. Erickson*, 505 F.2d 761, 763 (9th Cir. 1974). Moreover, a pre-plea claim of ineffective assistance of counsel also requires the defendant to show prejudice, *i.e.*, that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Hill*, 474 U.S. at 58-59.

A plea is not "knowing" or "intelligent" if the defendant is without the information necessary to assess "the advantages and disadvantages of a trial as compared with those attending a plea of guilty." *Brady v. United States*, 397 U.S. 742, 754-55 (1970). Additionally, a plea is not voluntary unless it is "entered by one fully aware of the direct consequences" of the plea. *Id.* at 755 (internal quotation and citation omitted); *see also Carter v. McCarthy*, 806 F.2d 1373, 1375 (9th Cir. 1986). A defendant must be advised of the range of allowable punishments that will result from the plea. *See Torrey v. Estelle*, 842 F.2d 234, 235 (9th Cir. 1988); *United States ex rel. Pebworth v. Conte*, 489 F.2d 266, 267 (9th Cir. 1974).

Moreover, findings made by the judge accepting a plea "carry a strong presumption of verity," and "constitute a formidable barrier in any subsequent collateral proceedings." *Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977); *Turner v. Calderon*, 281 F.3d 851, 881 (9th Cir. 2002) (petitioner's "self-serving statement, made years later," was insufficient to establish basis of claim); *see also United States v. Ruiz*, 536 U.S. 622, 629 (2002) ("the law ordinarily considers a waiver knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply in general in the circumstances – even though the defendant may not know the specific detailed consequences of invoking it.").

17

United States District Court

For the Northern District of California

1    Prior to Brown's guilty plea, Lopez obtained Brown's personal history, sought a

2    psychological evaluation, informed Brown of the charges and enhancements, explained the

3    possible defenses and options, and left the decision on how to proceed up to Brown.  EH RT 60,

4    74, 80-81, 109, 142.  Once Brown had made his decision to enter a plea of guilty, Lopez

5    explained the guilty plea process to him.  EH RT 80-81.  Furthermore, Brown clearly

6    understood that he was admitting two strikes that carried a potential life sentence, as

7    demonstrated by (1) his evidentiary hearing testimony that he understood he was admitting two

8    strikes; (2) his statements on the record at the time of the plea; (3) his previous experience with

9    guilty pleas and with the three strikes law; (4) Lopez's evidentiary hearing testimony that they

10   had discussed the plea numerous times both in person and on the phone and he made sure that

11   Brown understood the guilty plea process; and (5) the trial court's factual finding that Brown

12   understood the consequences of the plea and entered into it freely and voluntarily.  EH RT 35,

13   81-82, 139, 1471; Exh 3 at 5, 7-8.

14   Moreover, the Court finds Brown's vague and general claim, made seven years after the

15   guilty plea, that he "didn't really understand" and "didn't really know what [he] was getting

16   [himself] into" when he pled guilty, fails to overcome his statements on the record at the time of

17   the plea, which "carry a strong presumption of verity" and "constitute a formidable barrier in

18   any subsequent collateral proceedings."  *See Blackledge*, 431 U.S. at 73-74 (conclusory

19   allegations made after the original plea are subject to summary dismissal because

20   "representations of the defendant, his lawyer, and the prosecutor at such a hearing, as well as

21   any findings made by the judge accepting the plea, constitute a formidable barrier in any

22   subsequent collateral proceedings.").  Brown also failed to show that but for counsel's alleged

23   unprofessional errors, the result of the proceeding would have been different, *i.e.*, that he would

24   not have entered his plea but for his counsel's deficiency.

25   Accordingly, the Court finds that Brown's Sixth Amendment right to effective

26   assistance of counsel was not violated prior to and during Brown's guilty plea.

27

28

18

1        **2.        Brown's Sixth Amendment Right Was Not Violated Post-Plea.**

2              In addition to deciding the question of whether Brown's Sixth Amendment right to

3   counsel was violated pre-plea, the Court must also decide the question of whether Brown's

4   Sixth Amendment right to counsel was violated post-plea.  Thus, the Court must decide whether

5   counsel provided ineffective assistance at sentencing or whether counsel should have pursued a

6   motion to withdraw the plea.  *See Gardner*, 430 U.S. at 358 (holding that the right to effective

7   assistance of counsel attaches at all critical stages including sentencing).

8              After Brown pled guilty, Lopez prepared a comprehensive written *Romero* motion with

9   numerous supporting exhibits that included all the relevant information about Brown's social

10  history, substance abuse history, and mental health history.  Exh. A, CT 86.  The sources for the

11  motion included an interview with Brown; information from Brown's grandmother, Estella

12  Ballard; and a review of Brown's jail medical records, CDCR records, psychiatric records, the

13  mental health evaluation by Dr. Sanchez, parole records, Kaiser Permanente records, San Jose

14  Medical Center records, Atascadero State Hospital records, Navigator Behavioral Health

15  records, and probation reports from September 1985 and December 1995.  Exh. A, CT 86-104.

16  The motion included 24 pages of exhibits, including a letter from Brown's grandmother; an

17  interview with Brown's Navigator case manager, Filipa Rios; a 2005 mental health evaluation;

18  Dr. Sanchez's report; Rios' notes from Brown's participation in the Navigator program from the

19  initial referral in May 2005 to November 2005, after his arrest on the current offense; and

20  Brown's DSM diagnosis.  Exh. A, CT 106-30.

21             Lopez also presented oral argument at the sentencing hearing in an effort to dismiss one

22  or more strikes.  Lopez testified that he does not usually call live witnesses to testify at a

23  *Romero* hearing, although he makes that decision on a case-by-case basis.  EH RT 101, 146.  He

24  testified that he did not call Filipa Rios because "we had so much information from her that I

25  made a decision that it was not necessary to have her as a witness."  EH RT 143.  He further

26  testified that he did not call Dr. Roberts, a psychiatrist who had evaluated Brown, because

27  Roberts was out of the country, and his testimony was unnecessary in light of the other

28  psychological reports provided in the *Romero* motion.  EH RT 145, 146.  Also, he included in

United States District Court

For the Northern District of California

19

1    the *Romero* motion evidence that Brown had not been taking his medication around the time of

2    the current offense.  Exh. A, CT 93, 101. 109-110, 127-28.

3          Moreover, the Court finds that no *Marsden* hearing was required at the time of the

4    sentencing hearing.  Although the trial court had received the letter by that time, (1) Brown did

5    not indicate at the sentencing hearing that he still wanted to pursue a *Marsden* hearing, despite

6    the fact that he raised multiple issues he was concerned about with the court; (2) Brown did not

7    tell Lopez that he wanted to have a *Marsden* hearing at that point; and (3) Brown testified at the

8    evidentiary hearing that he did not seek a *Marsden* hearing because he did not hold grudges,

9    had forgiven Lopez, and just "didn't think of it."  EH RT 68.

10         Because Brown has not met his burden to show that Lopez was ineffective, the Court

11   holds that Brown's Sixth Amendment right to effective assistance of counsel was not violated

12   following Brown's guilty plea.

13         Accordingly, Lopez's performance does not fall below the objective standard of

14   reasonable performance and Brown is not entitled to federal habeas relief on this claim.

15                                          **CONCLUSION**

16         For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.  Rule

17   11(a) of the Rules Governing Section 2254 cases now requires a district court to rule on

18   whether a petitioner is entitled to a certificate of appealability in the same order in which the

19   petition is denied.  Petitioner has failed to make a substantial showing that his claims amounted

20   to a denial of his constitutional rights or demonstrate that a reasonable jurist would find the

21   denial of his claims debatable or wrong.  *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

22   Consequently, a certificate of appealability is not warranted in this case.  A separate judgment

23   shall issue, and the Clerk of the Court shall close the file.

24         **IT IS SO ORDERED.**

25

26   Dated: September 24, 2014                    _____

27                                                JEFFREY S. WHITE
                                                  UNITED STATES DISTRICT JUDGE

28

**United States District Court**
For the Northern District of California

20